**IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF GEORGIA
MACON DIVISION**

| | |
|---|---|
| **DAVID WILLIS,**<br><br>    *Plaintiff*,<br><br>**v.**<br><br>**NAVICENT HEALTH, INC.,**<br><br>    *Defendant*. | **CIVIL ACTION NO.**<br>**5:24-cv-00404-TES** |

**ORDER GRANTING DEFENDANT'S MOTION FOR SUMMARY JUDGMENT
AND DENYING DEFENDANT'S MOTION TO STRIKE AS MOOT**

Plaintiff David Willis was a hospital police officer injured on the job. After his injury, he worked on light duty, declined a dispatcher position, and his employer, Defendant Navicent Health, Inc., ultimately terminated him. On November 11, 2024, Plaintiff brought two claims under the Americans with Disabilities Act ("ADA") against Defendant. Defendant moved for Summary Judgment on both of Plaintiff's claims and moved to strike one of Plaintiff's expert witnesses as untimely disclosed. [Doc. 30]; [Doc. 31]. For the following reasons, the Court **GRANTS** Defendant's Motion for Summary Judgment [Doc. 31] and **DENIES** Defendant's Motion to Strike [Doc. 30] **as moot**.

## A.    LEGAL STANDARD

A court must grant summary judgment "if the movant shows that there is no

genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). A factual dispute is not genuine unless, based on the evidence presented, "'a reasonable jury could return a verdict for the nonmoving party.'" *Info. Sys. & Networks Corp. v. City of Atlanta*, 281 F.3d 1220, 1224 (11th Cir. 2002) (quoting *United States v. Four Parcels of Real Prop.*, 941 F.2d 1428, 1437 (11th Cir. 1991)); *see also Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). "The moving party bears the initial responsibility of informing the court of the basis for its motion." *Four Parcels*, 941 F.2d at 1437. The movant may cite to particular parts of materials in the record, including, "'the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any,' which it believes demonstrate the absence of a genuine issue of material fact." *Id.* (quoting *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986)); Fed. R. Civ. P. 56(c)(1)(A).[1] "When the *nonmoving* party has the burden of proof at trial, the moving party is not required to 'support its motion with affidavits or other similar material *negating* the opponent's claim[]' in order to discharge this 'initial responsibility.'" *Four Parcels*, 941 F.2d at 1437–38 (quoting *Celotex*, 477 U.S. at 323). Rather, "the moving party simply may show—that is, point out to the district court— that there is an absence of evidence to support the nonmoving party's case." *Id.* (quoting *Celotex*, 477 U.S. at 324) (cleaned up). Alternatively, the movant may provide

---

[1] Courts may consider all materials in the record, not just those cited by the parties. Fed. R. Civ. P. 56(c)(3).

"affirmative evidence demonstrating that the nonmoving party will be unable to prove its case at trial." *Id.*

If this initial burden is satisfied, the burden then shifts to the nonmoving party, who must rebut the movant's showing "by producing . . . relevant and admissible evidence beyond the pleadings." *Josendis v. Wall to Wall Residence Repairs, Inc.*, 662 F.3d 1292, 1315 (11th Cir. 2011) (citing *Celotex*, 477 U.S. at 324). The nonmoving party does not satisfy its burden "if the rebuttal evidence 'is merely colorable or[] is not significantly probative' of a disputed fact." *Id.* (quoting *Anderson*, 477 U.S. at 249–50). "A mere scintilla of evidence supporting the [nonmoving] party's position will not suffice." *Allen v. Tyson Foods, Inc.*, 121 F.3d 642, 646 (11th Cir. 1997).

At this stage, "credibility determinations, the weighing of the evidence, and the drawing of legitimate inferences from the facts are jury functions, not those of a judge." *Anderson*, 477 U.S. at 255. Succinctly put,

> [s]ummary judgment is not a time for fact-finding; that task is reserved for trial. Rather, on summary judgment, the district court must accept as fact all allegations the [nonmoving] party makes, provided they are sufficiently supported by evidence of record. So[,] when competing narratives emerge on key events, courts are not at liberty to pick which side they think is more credible. Indeed, if "the only issue is one of credibility," the issue is factual, and a court cannot grant summary judgment.

*Sconiers v. Lockhart*, 946 F.3d 1256, 1263 (11th Cir. 2020) (internal citations omitted).

The nonmovant's evidence is to be believed, and "all justifiable inferences are to be drawn in his favor." *Anderson*, 477 U.S. at 255. "[I]f a reasonable jury could make

3

more than one inference from the facts, and one of those permissible inferences creates a genuine issue of material fact, a court cannot grant summary judgment." *Sconiers*, 946 F.3d at 1263.

## B.    FACTUAL BACKGROUND

Plaintiff began working as a hospital police officer for Defendant in 2019. [Doc. 36-21, ¶ 1]. Two years later, in October of 2021, Plaintiff served an arrest warrant on an individual in the hospital. [*Id.* at ¶ 9]. He and the suspect started fighting over Plaintiff's taser. [*Id.*]. Plaintiff grabbed the suspect in a bear hug, fell to the floor, and held the suspect until another officer could use a taser to free Plaintiff. [*Id.*]. Plaintiff tore his shoulder during the fall. [*Id.* at ¶ 10]. He was specifically diagnosed with a right shoulder rotator cuff tear with retraction and biceps subluxation. [*Id.*]. He hoped to have surgery on his shoulder, but his surgeon refused to perform it because of his age. [*Id.* at ¶ 11]. Instead, the surgeon performed an arthroscopic debridement. [*Id.*]. What follows are slow-moving events over the course of two years.

Plaintiff was out of work from February 21, 2022, to April 5, 2022, and returned to work on April 6, 2022, in a less-intense role, or "Light duty." [*Id.* at ¶ 12]; [Doc. 36-6, p. 2]; [Doc. 36-19]. Part of his light-duty work included serving as a greeter during the COVID-19 pandemic and assisting with teaching classes to other Navicent Police Officers. [Doc. 36-21, ¶ 12.]. On August 29, 2022 — in connection with worker's compensation procedures —Plaintiff underwent a Functional Capacity Evaluation

("FCE") related to his right shoulder injury, performed by non-party Keith L. Blankenship, P.T. [*Id.* at ¶ 15].

In the FCE report, Mr. Blankenship unequivocally opined that Plaintiff "no longer qualifies for his regular duty job." [*Id.* at ¶ 16]. The FCE placed significant restrictions on Plaintiff's ability to perform certain essential functions of his job, including limiting him to a 20 lb. floor lift, 15 lb. shoulder lift, 25 lb. carry over 30 feet, and a 9 lb. overhead lift with his left arm only. [*Id.* at ¶ 17]. He had no ability to lift his right arm over his head. [*Id.*]. Plaintiff averaged an 83% right arm total strength deficit, which is made up of hand grip strength, one arm lifting strength, and one arm pulling-up strength. [Doc. 31-6, p. 2]. His results from a "Quick Dash Questionnaire" classified his injury as a "Severe Problem." [*Id.* at p. 3]. Finally, the FCE reported that Plaintiff himself "doesn't believe he can return to work on his regular Police Officer's Job at Atrium Health Navicent because of a fear of a reinjury . . . ." [*Id.* at p. 6]. Plaintiff's physician also signed the FCE. [*Id.* at p. 7].

When COVID ended, the CDC issued guidance that permitted Defendant to discontinue screening procedures, which, again, were part of Plaintiff's light duty responsibilities. [Doc. 36-21, ¶ 20]. As a result, the decision on what came next for Plaintiff became more relevant. On September 13, 2022, in an email chain between two human resources consultants for Defendant, they discussed the next stage in the worker's compensation process, which was for Defendant to "confirm whether or not

5

the permanent work restrictions can be accommodated to or not . . . . If they cannot accommodate, then that would likely result in a separation from employment for [Plaintiff] when we settle out the claim." [Doc. 36-2, p. 1]. The other consultant responded that Chief Crowder "has indicated that he cannot continue to accommodate the restrictions . . . [Chief Crowder] needs someone that can perform at full capacity and is eager to get this position filled." [*Id.*]. Since Defendant needed someone at full capacity in Plaintiff's position, the next step was for Defendant and Plaintiff to "negotiate a settlement." [Doc. 36-3, p. 5]. On October 31, 2022, Chief Crowder said he "may have a position available for [Plaintiff]." [*Id.* at p. 1]. On November 23, 2022, Plaintiff's police captain sent Chief Crowder an email with a document attached listing "job responsibilities" for Plaintiff and asked "if this is a good place to start." [Doc. 36-9, p. 1]. There is nothing on the record to indicate this list was ever acted upon.

Plaintiff requested to return to his role as a Police Officer. [Doc. 36-21, ¶ 21]. On January 10, 2023, during the discussions about Plaintiff's options, non-party Stephen Key—one of Defendant's Human Resource representatives—sent Plaintiff's physician a letter which asked questions "to help determine disability and reasonable accommodation." [*Id.* at ¶ 22]; [Doc. 31-7, p. 5]. The first question asked—after reference to an attached job description of a Navicent Police Officer—whether "the employee [was] able to perform the essential job functions of this position with or without reasonable accommodation? Yes/No." [Doc. 31-7, p. 5]. In response, Plaintiff's physician

6

wrote "[r]efer to FCE attached 8/29/23." [*Id.*]. The FCE, as a reminder, concluded that Plaintiff "no longer qualifies for his regular duty job." [Doc. 31-6, p. 2].

Because Plaintiff could not fully perform as a police officer, Chief Crowder offered him a position as a dispatcher within the Police Department in September of 2023, but Plaintiff declined. [Doc. 36-21, ¶ 26]. Specifically, he offered Plaintiff a night shift dispatch position with lower pay than Plaintiff was making as a police officer. [Doc. 36-10, p. 3]. Plaintiff rejected the position because he believed he did not have the required certifications for it. [Doc. 36-21, at ¶ 34]; [Willis Depo., p. 81:3–11]. That belief did not come from Chief Crowder, who never told Plaintiff he was not qualified. [Doc. 36-21, ¶ 34]; [Willis Depo., p. 81:3–11]. Instead, Chief Crowder told Plaintiff that the dispatch supervisor would train him. [Willis Depo., p. 84:12–14]. Lack of certification was the sole reason Plaintiff declined the position. [*Id.* at p. 86:8–9].

After Plaintiff declined the dispatcher position, Defendant terminated his employment in September of 2023. [Doc. 36-21, ¶ 36]. No one who worked for Defendant directly told him he was being terminated because of a disability.[2] [*Id.* at ¶ 43]. As a result of his termination, Plaintiff suffered grief and heartache from losing "a job that [he] loved." [Willis Depo, p. 126:12–18]. He also cashed out his 401(k) after termination. [*Id.* at pp. 127:1–129:10]. Plaintiff currently performs a sales position

---

[2] Plaintiff emphasizes the online classification of his termination. But, emails between Chief Crowder and human resources correspondents reveal that they were "limited to the available options in [their software]." [Doc. 36-17, p. 5]. So, they decided to process it as a "resignation for personal reasons." [*Id.*].

without restrictions. [Doc. 36-21, ¶ 41].

Since it's relevant for this case, the following is an overview of Defendant's qualifications and/or descriptions for both its police officer role and its dispatcher role. First, the police officer role. Hospital police (working for Defendant, specifically) perform general law enforcement duties and respond to all acts of violence within the hospital, including the Emergency Center and 6 East. [*Id.* at ¶ 5]. The official job description for "Hospital Police" includes a "physical demands" specifications section. [Doc. 31-4, p. 3]. Among other physical requirements, hospital police

> [m]ust be able to assist co-workers in transfers and transport supplies, patients/residents, or equipment using good body mechanics. Must have functional range of motion of the . . . upper and lower extremities with a grip strength of 60-80 pounds . . . Must be able to forward reach, overhead reach, bend, squat and kneel and change from one position to the other rapidly. Must be able to lift 25–60 lbs. and carry 25-50 pounds specific to job class evaluation.

[*Id.*]. The most physically demanding part of working as a police officer for Defendant is dealing with mental health patients and combative patients or visitors. [Doc. 36-21, ¶¶ 3, 7]; [Willis Depo., p. 40:1–11].

While Defendant's official job description for dispatchers is not on the record, the parties have discussed the certification requirements for dispatchers at length. Additionally, Chief Crowder—the head of the police department at Navicent—started as a dispatcher. [Crowder Depo., p. 7:3–6]. In sum, all dispatchers need to be certified to access state and national criminal databases, called the GCIC/NCIC certification. [Doc.

36-21, ¶ 30]; [Crowder Depo., p. 18:1–25]. Not all dispatchers for Defendant are POST certified. [Doc. 36-21, ¶ 29]; [Crowder Depo., p. 17:3–5]. According to Chief Crowder, once a candidate is hired to work as a dispatcher, the dispatch supervisor "coordinates with getting that training up to speed where it needs to be . . . ." [Crowder Depo., p. 19:7–12]. Until the GCIC/NCIC certification is complete, the new candidate is "paired with a training officer who's teaching them how to perform in dispatch . . . ." [*Id.* at p. 19:20–24]. This process usually lasts about eight weeks. [*Id.* at p. 20:2–13]. In other words, according to Chief Crowder, new candidates go through an onboarding process while they receive their necessary certifications.

## C.    DISCUSSION

Defendant moves for summary judgment on nearly every aspect of Plaintiff's two ADA claims. Under the ADA, "No covered entity shall discriminate against a qualified individual on the basis of disability in regard to job application procedures, the hiring, advancement, or discharge of employees, employee compensation, job training, and other terms, conditions, and privileges of employment." 42 U.S.C. § 12112(a) (emphasis added). Therefore, "an ADA plaintiff establishes a prima facie case by showing (1) [he] has a disability; (2) [he] is a qualified individual under the ADA; and (3) the employer discriminated against [him] on the basis of disability." *Akridge v. Alfa Ins. Companies*, 93 F.4th 1181, 1191–92 (11th Cir. 2024) (citing *Beasley v. O'Reilly Auto Parts*, 69 F.4th 744, 754 (11th Cir. 2023)); *see also* 42 U.S.C. § 12112(a).

At the outset, Defendant argues that Plaintiff was not—and is not—disabled under the ADA. [Doc. 31-1, p. 5]. But, the Court need not decide that issue at this time. The Court will assume—but without deciding—that Plaintiff is disabled under the ADA. Now the Court turns to the second element of an ADA claim. Plaintiff's claims fail under the second element because he is not a qualified individual as that term is defined in the ADA.

A qualified individual with a disability is "an individual who, with or without reasonable accommodation, can perform the essential functions of the employment position that such individual holds." *Id.* at § 12111(8). Thus, an employee "must show either that he can perform the essential functions of his job without accommodation, or, failing that, show that he can perform the essential functions of his job with a reasonable accommodation." *Davis v. Fla. Power & Light Co.*, 205 F.3d 1301, 1305 (11th Cir. 2000). If, however, an employee "is unable to perform an essential function of his job, even with an accommodation, he is, by definition, not a 'qualified individual' and, therefore, not covered under the ADA." *Id.* (alteration adopted).

Whether a duty constitutes an essential function is determined on a case-by-case basis. *See Holly v. Clairson Indus., L.L.C.*, 492 F.3d 1247, 1258 (11th Cir. 2007). Courts give the employer's view of what constitutes an essential function substantial, but not

10

controlling, weight. *Id.* at 1258. [3] This includes the employer's written job description. *Id.* at 1257. Courts also consider the ADA's guidance. *See* 29 C.F.R. § 1630.2(n). Finally, the frequency of certain duties within a job are not dispositive. *See Marquez v. Costco Wholesale Corp.*, 550 F. Supp. 3d 1256, 1282 (S.D. Fla. 2021) ("However, 'the percentage of time spent on a job function is not dispositive of whether the function is an essential function'") (quoting *Flores v. Am. Airlines Inc.*, 184 F. Supp 2d 1287, 1292 (S.D. Fla. 2002)); *Bagwell v. Morgan Cnty. Comm'n*, No. 5:14-CV-00464-CLS, 2015 WL 13307343, at *7 (N.D. Ala. Oct. 28, 2015), *aff'd*, 676 F. App'x 863 (11th Cir. 2017) ("The fact that a task is rarely performed does not automatically render it non-essential, or marginal"); *C.f. Cremeens v. City of Montgomery, Ala.*, 427 F. App'x 855, 858 (11th Cir. 2011) ("Fire Investigators may engage in fire suppression activities infrequently, but that does not mean firefighting is a nonessential function of the position. Indeed, the firefighting function is essential whenever the need arises . . . ."); *C.f. Holbrook v. City of Alpharetta*, 112 F.3d 1522, 1527 (11th Cir. 1997) (police officer's duties of driving an automobile and collecting evidence at crime scenes were essential functions even though the plaintiff

---

[3] Plaintiff attempts to argue that a jury should determine exactly what are the essential functions of a job. [Doc. 36, p. 10]. To the extent Plaintiff may be arguing that this question is inappropriate on summary judgment, the Court disagrees. *See Birmingham v. Hyundai Motor Mfg. Ala., LLC,* No. 25-10938, 2026 WL 893743, at *3 (11th Cir. Apr. 1, 2026) (affirming summary judgment on essential functions grounds). Employers can determine what functions are essential to a certain position within their organization. Perhaps, in the limited situation where an employer offers evidence that an employer doesn't actually require employees to perform functions it has deemed as essential, a jury could potentially be called upon to decide if those functions are really essential. But, Plaintiff has neither offered such evidence nor has he made similar arguments. Accordingly, the Court accepts Defendant's designation of the essential functions of a police officer.

rarely performed those duties because it was "not possible to anticipate" the extent to which those duties would need to be performed in the future.).

Here, Defendant's job description of a hospital police officer requires a "functional range of motion of the . . . upper and lower extremities," and "a grip strength of 60-80 pounds." [Doc. 31-4, p. 3]. Under the job description, officers must also "be able to forward reach" and "overhead reach." [*Id.*]. Finally, officers under the job description "[m]ust be able to lift 25-60 lbs. and carry 25-50 pounds specific to job class evaluation." [*Id.*]. As noted by his FCE, Plaintiff could lift no more than 20 lbs. from the floor and he could only carry a maximum 25 lb. carry for no more than 30 feet – clearly showing that he could not meet these essential functions.

During his deposition, Plaintiff stated that "you could call it routine" for hospital police to get calls to restrain mental health patients.[4] [Willis Depo., p. 42:1–8]. Hospital police also help effectuate arrest warrants. [*Id.* at p. 49:4–6]. Chief Crowder also stated that hospital police "pretty often" must physically restrain someone. [Crowder Depo., p. 24:18–23]. In fact, he said physically restraining someone is "expected" for a hospital police officer. [*Id.* at p. 25:3–5].

The Court concludes that physically subduing patients or visitors within the

---

[4] In his deposition, Plaintiff repeatedly emphasized that, in restraining someone, "[i]t's not always required to be physical." *See, e.g.*, [Willis Depo., p. 77:1–12]. He emphasized that officers "always make an attempt to talk to them and verbally deescalate the situation prior to ever trying to put hands on them." [*Id.*]. But, he did not say physical restraint is never used. He even agreed that physical force is expected "if necessary." [*Id.* at p. 78:8–13].

hospital is an essential function of hospital police officers at Navicent, despite the frequency of this function being "not possible to anticipate." *Holbrook*, 112 F.3d at 1527. The unpredictability of these situations—again, being not possible to anticipate— necessarily requires the use of both arms, and Plaintiff has offered no reason why the requirements within Defendant's job description are inadequate for this area. In other words, like firefighters who may unpredictably have to suppress fires, hospital police may unpredictably have to restrain patients or visitors. *See Cremeens*, 427 F. App'x at 858. Both suppressing fires and restraining patients or visitors are still essential functions.

The record shows that Plaintiff cannot perform the essential functions of a hospital police officer. Plaintiff himself stated that the FCE's restrictions are still applicable. [Willis Depo., p. 121:13–15 (responding that his current medical restrictions are "Whatever is on the FCE.")]. He has not been to the doctor for his shoulder "in a long time," and has not filed any medical evidence of his shoulder's abilities other than those in the FCE.[5] [*Id.* at pp. 121:16–122:2]. The FCE unequivocally states that Plaintiff can't lift his right arm above his head and has an 83% right arm strength deficit. [Doc. 31-6, p. 2]. In sum, Plaintiff offers nothing to refute the FCE's conclusion that Plaintiff

---

[5] In his deposition, Plaintiff states that he believes he can perform the abilities of a police officer. [Willis Depo., p. 123:1–8]. But, stating that he believes he can perform the duties does not "show" that he can. *Akridge*, 93 F.4th at 1191–92. This is especially so considering Plaintiff states the FCE is still in effect. [Willis Depo., p. 121:13–15].

"no longer qualifies for his regular duty job." [*Id.* at ¶ 16]. Based on the undisputed FCE report, the Court finds that Plaintiff is not a qualified individual under the ADA, so Defendant is entitled to summary judgment on both of Plaintiff's claims.

Plaintiff makes three arguments against this conclusion. First, he argues that "[u]se-of-force situations always involved multiple officers," and the job description for a police officer does not require "that the officer routinely perform[] solo bilateral restraint." [Doc. 38, p. 9]. But, as the Court stated above, the frequency or infrequency of an action does not necessarily affect whether it is an essential function. It does not affect the essential-function question here. As for Plaintiff's multiple-officer argument, "[a] nurse can do the job of a neurosurgeon if given a little 'help' . . . ." *Bivins v. Bruno's, Inc.*, 953 F. Supp. 1558, 1562 (M.D. Ga. 1997), *aff'd*, 247 F.3d 245 (11th Cir. 2001). "The analogy may tend to the extreme, but the principle at stake is identical: *anyone* can do *anything* with 'help' from another person who does all the difficult parts of the job for you." *Id.* Plaintiff's own experience shows that officers need to be fully capable of restraining someone without aid. After all, Plaintiff needed both arms to bear hug the patient that injured him, even with another officer present. In that situation, and in other situations where someone needs to be restrained—even with other officers around—there is no guarantee that Plaintiff would not be the officer doing "all the difficult parts" of restraining someone, like bear hugging them. In other words, he needs to be capable of doing it on his own – just as his job requires.

14

Second, he argues that Plaintiff's captain's proposed job description "carries substantial weight against the generic FCE." [Doc. 36, p. 10]. But, the captain's proposed job description—titled "Officer Willis' responsibilities and job duties"—does not establish the essential functions of a hospital police officer. Nor does it have any bearing on whether Plaintiff is a qualified individual to perform the essential functions of a hospital police officer under the ADA. *See Pickering v. City of Atlanta*, 75 F. Supp. 2d 1374 (N.D. Ga. 1999), *aff'd*, 235 F.3d 1344 (11th Cir. 2000) (discussing the common difference between light duty positions and accommodations). Additionally, the fact that Plaintiff performed many of these light duties while injured has no bearing on whether he is a qualified individual to perform the essential functions of a hospital police officer under the ADA. *Id.*; [Doc. 36, p. 11].

Third, Plaintiff argues that "[t]he accommodation question was never answered" because Plaintiff's physician wrote "refer to FCE" when asked whether Plaintiff could perform his essential functions "with or without reasonable accommodation." [Doc. 36, p. 10]. But, the FCE unequivocally states that Plaintiff "no longer qualifies for his regular duty job that occasionally requires him to use both Arms to restrain overly combative patients." [Doc. 31-6, p. 2]. In other words, the answer from Plaintiff's

15

physician was no.[6]

###### D.    CONCLUSION

For the reasons laid out above as well as many others in Defendant's pleadings,[7]

the Court **GRANTS** Defendant's Motion for Summary Judgment. [Doc. 31]. With no

remaining claims, the Court **DENIES** Defendant's Motion to Strike **as moot**. [Doc. 30].

**SO ORDERED**, this 6th day of July, 2026.

S/ *Tilman E. Self, III*

**TILMAN E. SELF, III**
**UNITED STATES DISTRICT JUDGE**

---

[6] To the extent Plaintiff argues the physician did not point to accommodations, that burden rests on Plaintiff. *Willis v. Conopco, Inc.*, 108 F.3d 282, 287 (11th Cir. 1997). Plaintiff's only attempt at doing so is to point to his temporary light duty position, which, as the Court previously stated, is separate from an accommodation. *See* [Willis Depo., p. 79:17–80:3 (describing how his job duties on light duty differed from those of a full duty police officer)].

[7] Chiefly, Plaintiff's reasonable accommodation claim also fails because his *only* requested accommodation was to "go back to work doing [the] job [he'd] been doing the whole time," which is, under black-letter law, not a reasonable accommodation. [Willis Depo., p. 63:1–9]; *D'Onofrio v. Costco Wholesale Corp.*, 964 F.3d 1014, 1021 (11th Cir. 2020) (duty to provide accommodation not triggered unless employee makes a specific demand). Moreover, Plaintiff offered no evidence that he had requested an accommodation that would actually allow him to complete the essential functions of a police officer. By asking to return to work, Plaintiff effectively asked Defendant to omit certain functions it had deemed essential for him. But, employers aren't required to water down essential functions of a job – they are entitled to employees capable of doing the job. *Holbrook*, 112. F.3d at 1527–1528.

Plaintiff's disparate treatment claim also fails because Plaintiff has not presented sufficient evidence to show why Defendant's nondiscriminatory reason for terminating Plaintiff—he could not perform the essential functions of a police officer—was unreasonable. *See Cleveland v. Home Shopping Network, Inc.*, 369 F.3d 1189, 1193 (11th Cir.2004); *Perry v. City of Avon Park, Fla.*, 662 F. App'x 831, 837 (11th Cir. 2016) (condition preventing the plaintiff from performing essential functions of her position was "legitimate, non-discriminatory reason for her termination").

16